# MATTER OF BAPTIST EDUCATIONAL CENTER

## Withdrawal of Recognition

### Decided by Board September 20, 1993

(1) In a proceeding under 8 C.F.R. § 292.2(c) (1993) to withdraw recognition of an organization authorized to practice before the Immigration and Naturalization Service and the Board of Immigration Appeals, an organization seeking to retain its status as a recognized organization must demonstrate by clear, unequivocal, and convincing evidence that it continues to satisfy the requirements for recognition under 8 C.F.R. § 292.2(a) (1993).

(2) The Board terminated the respondent's status as a recognized organization under 8 C.F.R. § 292.2(c) (1993), having found that the respondent had not established by clear, unequivocal, and convincing evidence that it was a non-profit organization, independent of and separate and apart from its founder and representative, Reverend Marc Azard, a non-lawyer who used the respondent's recognition as a means of continuing his immigration counseling practice to receive income for himself.

ON BEHALF OF RESPONDENT:
Kurt G. Clarke, Esquire
6065 Hillcroft, Suite 501
Houston, Texas 77081

ON BEHALF OF SERVICE:
Dorothy Stefan
General Attorney

BY: Dunne, Acting Chairman; Morris and Vacca, Board Members

On February 13, 1992, the district director issued a Notice of Intent to Withdraw Recognition of the respondent pursuant to 8 C.F.R. § 292.2 (1992). In a decision dated June 17, 1992, the immigration judge issued findings of fact and a recommendation that the respondent's recognition as an organization qualified to represent individuals in matters before the Immigration and Naturalization Service and the Board of Immigration Appeals (including the immigration judges) be terminated. Based upon our review of the record, the respondent's recognition will be withdrawn.

Pursuant to 8 C.F.R. § 292.2(a) (1993), a nonprofit religious, charitable, social service, or similar organization established in the United States may be recognized by the Board of Immigration Appeals. Such an organization must establish to the satisfaction of the Board that it makes only nominal charges, that it assesses no excessive membership dues for persons given assistance, and that it has at its disposal adequate knowledge, information, and experience in immi-

gration law and procedure. An organization recognized by the Board under 8 C.F.R. § 292.2(a) (1993) may apply for accreditation of persons of good moral character as its representatives. An organization may apply to have a representative accredited to practice solely before the Immigration and Naturalization Service, or before the Immigration and Naturalization Service and the Board of Immigration Appeals (which includes practice before the immigration judges). An application for accreditation must fully set forth the nature and extent of the proposed representative's experience and knowledge of immigration and naturalization law and procedure and the category of accreditation sought.

On February 13, 1992, the district director issued a Notice of Intent to Withdraw Recognition in the respondent's case. Hearings were held on April 27 and 28, 1992, before an immigration judge. At these hearings the Service presented evidence and testimony of witnesses in support of its case. This evidence discloses that on November 5, 1990, the respondent applied for recognition under 8 C.F.R. § 292.2 (1990) and requested accreditation for Rev. Marc Azard to practice before the Service and the Board. At the hearing, the Service submitted the respondent's original request for recognition and accreditation for Rev. Marc Azard as its representative. In its submission the respondent had presented documentation to show that it was incorporated in the State of Texas on August 16, 1990, and stated that it would replace Main World Immigration Service, an organization recognized by the Board, as such organization, which was supported by the South Main Baptist Church, was terminating its operation on December 31, 1990. In its submission for recognition, the respondent stated that it was supported by several Baptist churches in Houston and that "there [sic] pastors and congregations have pledged to support this ministry with financial support and prayers." In its original submission, the respondent listed its address as 12377 Dairy Ashford Road in Houston and stated that it would impose no charges or membership fees for its services. The respondent also included a copy of its Articles of Incorporation which reflect its Dairy Ashford Road address and state that its incorporators are Marc Azard, Esther Azard, and Daniel Pantlitz. These Articles also list the Azards' address as 12377 Dairy Ashford in Houston. Concerning the qualifications of Rev. Azard, the respondent offered his resume in its original request for recognition and accreditation of Rev. Azard. This document reflects that Rev. Azard is a graduate of a law school in Texas. He had been employed by Main World Immigration Service in its immigration counseling program from June 1976 until its termination in December 1990 and he worked as a researcher and aide in immigration matters for two attorneys from 1978 until 1989. Letters of support from various

individuals attesting to Rev. Azard's good moral character were also submitted. As required by 8 C.F.R. § 292.2(b) (1993) the district director submitted his recommendation and proposed that the respondent's request be favorably considered. In a decision dated March 12, 1991, the Board granted the respondent's requests for recognition and for accreditation of Rev. Azard as it accredited representative authorized to practice before the Service and the Board. The roster of recognized organizations maintained by the Board during the period at issue lists the respondent's address as 12377 Dairy Ashford Road in Houston.

The record further reflects that in correspondence dated October 2, 1991, the Service and the Board were contacted by an attorney from Houston, Texas, who noted that the list of accredited representatives which is distributed to indigent aliens by the Service in Houston contained a listing for a private law firm, Fuller and Clark, located at 6065 Hillcroft, Suite 501, in Houston with Marc Azard as the accredited representative. As a result of such correspondence, on October 17, 1991, the Service prepared a report based upon an investigation conducted by a Service special agent. In this report, the agent states that the Houston telephone directory lists 12377 Dairy Ashford as the residence of Marc Azard. An investigation conducted at that address revealed that it was a residence located in a townhouse community. No signs or placards were located there. The Service agent interviewed the United States postal worker in that vicinity who stated that he recognized 12377 South Dairy Ashford as the address to which he delivers mail in the name of Marc Azard, and he further stated that he did not recognize the respondent's name and never delivered mail to the respondent at the Dairy Ashford address. In this report the Service agent also states that he visited 6065 Hillcroft Avenue in Houston, where the directory of the office building reflected that Dr. Marc Azard occupied Suite 501. He further states that the door leading to Suite 501 had three separate placards on it, including Kurt G. Clarke, attorney at law, K. Omari Fullerton, attorney at law, and Dr. Marc Azard with no other identifying data. Finally, as part of his report, the Service agent interviewed Phil Martin, senior administrator of the South Main Baptist Church of Houston, which operated Main World Immigration Service, an organization which was previously recognized by the Board under our regulations. Mr. Martin informed the Service agent that Rev. Azard was in charge of that program, but that its operations ceased on December 31, 1990, and Rev. Azard's employment was terminated as of that date. Mr. Martin also stated that South Main Baptist Church is in no way affiliated with the respondent and that he was not familiar with the Baptist Educational Center.

At the hearing concerning the Service motion to withdraw the respondent's right to practice before it and the Board, the Service also offered into evidence an updated investigative report dated February 18, 1992, prepared by Michael Bouras, a Service special agent. In this report, Rev. James Turner of the South Main Baptist Church was interviewed and verified that that church does not provide assistance or financial support to the respondent. An investigation at 6065 Hillcroft, Suite 501, in Houston disclosed that Rev. Azard had moved to Suite 510 at that address but, although a name plate on the door identified the occupant as Rev. Azard, no mention is made of the respondent. The investigator further states in his report that the entrance to Suite 501 is approximately 20 feet from Suite 510.

The investigator also interviewed Marc Azard on January 22, 1992. Rev. Azard claimed that the respondent was incorporated using Azard's home address due to lack of funds to rent office space. He further stated that when Main World Immigration Service ceased operations, he had been involved in many ongoing immigration cases which he could not drop and that recognition of the respondent allowed him to continue his participation in these matters. He acknowledged that initially he was provided office space by attorney Clarke who permitted him to use his office on weekends but he stated that the respondent now maintains a separate office. Rev. Azard also informed the investigator that the respondent receives no support from any area churches or from any source other than represented aliens. Rev. Azard also provided the investigator with bank statements allegedly pertaining to the respondent, but such statements disclose that this account is a personal account of Marc and Esther Azard at the Bank of Houston. The respondent's minutes of its Board of Directors meetings were included in the investigative report and reflect in pertinent part that the respondent shared office space with attorney Clarke, that the organization's funds were deposited in a personal account of Rev. Azard and his wife, and that Mr. Clarke agreed to represent the respondent's clients until recognition was granted.

As part of this investigation, former clients of the respondent were interviewed by Service investigator Bouras. Mario Santos-Aparisio stated that he first met Rev. Azard in November 1990 when he contacted Main World Immigration Service for legal assistance involving his and his wife's deportation case, for which services each paid $75 to Main World. This individual also stated that he again contacted Rev. Azard in January 1991 at the 6065 Hillcroft address where he observed that Rev. Azard had an office with other attorneys. This individual also informed the investigator that Rev. Azard told him that continuation of the case required an additional $350 which he paid to Rev. Azard. Lynette Phillip, a former client of the

respondent's, was also interviewed. She informed the investigator that she contacted Rev. Azard based on the Accredited Organizations List, which she was provided by the Service when she was served with an Order to Show Cause in her deportation case. She stated that she met with Rev. Azard on April 17, 1991, at the fifth floor address at 6065 Hillcroft and stated that he seemed to be sharing office space with two other attorneys, including Kurt Clarke. She further stated that, when Rev. Azard introduced her to Mr. Clarke, Rev. Azard began to discuss her case with him and Mr. Clarke stated he could represent her for $3,000. When she explained to him that she did not have such funds, Mr. Clarke left but Rev. Azard continued to encourage her to have Mr. Clarke handle her hearing. Eventually she agreed to pay Mr. Clarke $300 for representation but he refused further representation until she paid him $3,000. She further stated that she paid no money to Rev. Azard, who never mentioned the respondent to her. Documentation in the record concerning Rev. Azard's acquaintance with Ms. Phillip includes a Notice of Appearance (Form G-28) in her case dated June 28, 1991, another dated September 19, 1991, from the respondent, signed by Marc Azard and listing the respondent's address as Suite 501 at 6065 Hillcroft, and a Notice of Appearance (Form G-28) dated May 22, 1991, signed by Kurt Clarke and listing his address as Suite 501, 6065 Hillcroft; a brief which is dated August 28, 1991, in Ms. Phillip's case from Marc Azard, who signed such document "Marc Azard, J.D., representative" and lists his address as Suite 501, 6065 Hillcroft; letters dated May 22, 1991, and July 8, 1991, from Kurt Clarke to the Service, requesting work authorization for Ms. Phillip; and correspondence dated July 12, 1991, from Mr. Clarke to Ms. Phillip stating that as the fee for her case is $2,000 and she has paid only $300 (receipt attached), he will no longer represent her unless she remits the balance. Concerning Ms. Phillip's case, an affidavit from her new representative, Nancy Falgout, was also submitted by the Service at the hearing. In this affidavit Ms. Falgout states that she has listened to the recorded transcript of Ms. Phillip's July 3, 1991, deportation hearing and that this transcript reveals that Rev. Azard and Mr. Clarke both appeared at and participated in that hearing as her representatives.

In the investigative report dated February 18, 1992, investigator Bouras related that he also spoke with another of Rev. Azard's former clients, Miguel Andrade-Vivar, who supplied the investigator with his affidavit. Mr. Andrade-Vivar stated that he first met Rev. Azard on December 10, 1990, at Main World Immigration Service. He stated that immediately prior to that time, his wife paid Rev. Azard $420 for a bond reduction hearing. At the December 10, 1990, meeting, Rev. Azard informed him that he had moved to a new address at Suite 501, 6065 Hillcroft and that he required a retainer of $300 to continue the

case, which Mr. Andrade-Vivar paid. This affiant further stated that on January 10, 1991, he went to the Hillcroft Street offices to discuss the upcoming deportation hearing and Rev. Azard introduced him to attorney Clarke, who suggested reopening the affiant's criminal conviction. Although the affiant then informed Rev. Azard that he wanted him to represent him at the hearing, the affiant was surprised that on the date of his deportation hearing on January 17, 1991, before the respondent's recognition was granted by the Board, Mr. Clarke, not Rev. Azard, appeared to represent him. The transcript of that hearing reflects that Mr. Clarke informed the immigration judge that he was representing the affiant and when the immigration judge asked concerning Rev. Azard's status, Mr. Clarke replied that Rev. Azard was now working for him out of his office. In his affidavit, Mr. Andrade-Vivar states that he had another meeting with Rev. Azard and that Rev. Azard again encouraged him to let Mr. Clarke reopen his criminal case for $20,000. The affiant stated that he informed Rev. Azard he could not afford such expense. Subsequently, the affiant paid Rev. Azard $100 and again on July 22, 1991, $400 for an appeal concerning his case. Mr. Andrade-Vivar supplied the Service with receipts for such expenses which are included in the record. Notices of Appearance in Mr. Andrade-Vivar's case include one from Mr. Clarke dated January 17, 1991, giving his address as Suite 501 at 6065 Hillcroft; one from Marc Azard, received by the Service on January 10, 1991, and citing his association with Main World Immigration Service; and another from Marc Azard dated July 20, 1991, listing his affiliation with the respondent and the respondent's address as 6065 Hillcroft, Suite 501.

In support of the case for decertification of the respondent the Service also presented other evidence in order to show that the respondent did not qualify as a nonprofit charitable or similar organization. Such evidence includes Notices of Appearance filed in the case of one alien by Marc Azard as the respondent's representative with correspondence sent by the Service in such case to Mr. Clarke. It also includes such Notices of Appearance filed by Rev. Azard in August and September 1991 as the respondent's representative, yet listing the address of Mr. Clarke. Other evidence of Rev. Azard's association with Mr. Clarke includes correspondence dated October 11, 1991, from Rev. Azard to the Service informing that agency of the respondent's address at 6065 Hillcroft, Suite 501. Concerning the respondent's fee policy, the Service also presented receipts paid by the respondent's clients for services rendered by Rev. Azard. Such documentation includes a $400 fee paid to Rev. Azard on March 3, 1991, by Gonzalea Cristobal; a fee of $175 paid to Mr. Clarke on August 30, 1991; a fee of $200 paid on an account of $450 owed to

Rev. Azard by Delfina Soa on September 26, 1991, and $200 paid on an account of $850 by Maria Fiones on November 18, 1991. These fee receipts included two receipts for attorney Clarke. This documentation was obtained by investigator Bouras from Rev. Azard in the course of his investigation. Also introduced as evidence by the Service was correspondence dated April 12, 1988, from George Nelly of the State Bar of Texas, Unauthorized Practice of Law Committee, stating that during their investigation of a complaint against Rev. Azard, two witnesses were interviewed "who advised me that [Rev. Azard] represented himself as being a licensed attorney and received approximately $700 from them as attorney's fees while purporting to represent them before the Immigration and Naturalization Service." At the conclusion of the hearing the Service also submitted without objection correspondence dated April 29, 1992, from the Texas Comptroller of Public Accounts stating that the Baptist Educational Center "is not in good standing. The corporation has not satisfied all state tax requirements."

The Service also presented evidence concerning the competence of Rev. Azard. The Service solicited opinions on this issue from four immigration judges before whom Rev. Azard has appeared. Two immigration judges opined that Rev. Azard was not qualified, while the remaining were unwilling or unable to state their opinion. The Service also presented documentation from the Texas Board of Law Examiners which reflects that Rev. Azard failed to pass the bar examination on seven occasions, and from the Committee on Bar Admissions of the Louisiana State Bar Association stating that Rev. Azard was not successful in his attempt to pass the bar of that state.

At the hearing the Service also presented testimony from witnesses in order to support or confirm the veracity of the documentary evidence submitted. Investigator Bouras who prepared the investigative report of February 18, 1992, testified to verify the contents of that report. In his testimony, he confirmed that to the best of his knowledge the respondent performed no business at the Dairy Ashford Drive address. He also stated that there was nothing at the 6065 Hillcroft address to identify the respondent as doing business there. He verified that he interviewed the three clients of the respondent whose accounts were detailed in his report. He confirmed that any monies paid by these individuals for immigration services were paid directly to Marc Azard and no fees were paid to the respondent. In this regard he confirmed that Marc Azard showed him evidence that the respondent did not have a separate bank account, and he stated that the fee receipts of the respondent's clients attached to his investigative report were shown to him by Rev. Azard and that such receipts did not identify the respondent as the payee, but in fact identified Rev. Azard

or, in two cases, Mr. Clark as the recipient. He further testified that these receipts were shown to him as evidence of the respondent's work. This witness also confirmed that the respondent had not paid its franchise tax as required under Texas law and it had thereby lost its right to do business as of November 1991.

In support of its case the Service also presented the testimony of two of the respondents' alleged clients whose accounts were profiled in the February 18, 1992, investigative report, Lynette Phillip and Miguel Andrade-Vivar. In her testimony, Ms. Phillip stated that she contacted the respondent because she needed free legal assistance. She testified that she obtained the respondent's name from the list of recognized organizations provided to her by the Service. She first met Rev. Azard at the 6065 Hillcroft address in Suite 501, where he had his own office in a suite occupied also by Mr. Fullerton and Mr. Clarke. She testified that when she met Rev. Azard, he introduced her to Mr. Clarke and that she had the impression that the two men worked together. She further stated that, although she wanted only Rev. Azard to represent her, Mr. Clarke also became involved in her case, as both appeared with her at her hearings and Mr. Clarke attempted to obtain work authorization for her. She stated also that she agreed to pay Rev. Azard $300 for his services but that he had her pay Mr. Clarke that fee instead. In his case, Mr. Andrade-Vivar stated that he first met Rev. Azard in December 1990 when Rev. Azard was associated with Main World Immigration Service. Subsequently in January or February 1991, he met with Rev. Azard at the Hillcroft office, where nothing identified the premises as the respondent's offices. When Rev. Azard met with him, he was introduced to Mr. Clarke, who pressured the witness to retain him as his attorney, advising the witness to reopen his criminal conviction for a fee of $20,000. Although the witness stated that he was not willing to follow Mr. Clarke's advice on that matter, Mr. Clarke did briefly appear on his behalf at the initial hearing in his case. This witness further stated that he paid Rev. Azard over $1,100 in legal fees including $400 to file an appeal.

In support of its claim that it was entitled to continued recognition under the regulations, the respondent presented the testimony of Marc Azard. Rev. Azard stated that he was employed by the respondent but that he also was a minister and that he did not receive any funds from the respondent. He maintained that he incorporated the respondent for charitable purposes, including the providing of legal assistance for indigent aliens, and explained that due to lack of funds, the respondent was initially unable to obtain office space until Mr. Clarke donated such facilities in his suite. Rev. Azard claimed that the respondent had a bank account for its funds and expenses. He acknowledged that such account was in his name and that some of the monies in it were his

730

own and that checks drawn on the account were issued to him. He explained that he was told by bank officials that, because the respondent did not have an identification number, the account must be in his name, and he asserted that the respondent's Articles of Incorporation are on file with the bank in connection with the account. Concerning the respondent's status, the witness admitted that the respondent had not filed income tax returns and that he reports no sales to state authorities. He claimed that the respondent maintained a ledger of income and expenses but that he could not present it, as it was then unavailable. Concerning the respondent's fee policy, Rev. Azard stated that the respondent has "a procedure to have some donations, collections from clients, so we can carry [on] the work," and he testified that "what I impose I would say is a kind of donation, call it fees, but I ... I characterize it as a donation for the service rendered ... and I don't think it's imposed, it's willing," as he stated he would ... not refuse assistance if no donation is made. Concerning his services, the witness stated "I have a policy ... the 212(c) really I charge $250 or donation for $250. Master calendar is $100, $100 for an I-130 for each family member." He further acknowledged that the respondent had not received any funding from any organizations but plans to obtain such resources in the future, explaining that it was his belief that the respondent had to be in existence for a time before it could seek funds from the conference of Baptist churches.

Concerning the respondent's relation with Mr. Clarke, the witness denied that he was employed by Mr. Clarke. He further stated that after his affiliation with Main World Immigration Service ceased, Mr. Clarke offered him the use of his suite, but that he was not to use the phone and stationary and that he should only use the office to see clients on Saturday when Mr. Clarke was not present. The witness claimed also that after a month the respondent obtained its own space, subleasing an office and paying rent to Mr. Clarke. Rev. Azard also acknowledged that he has access to Mr. Clarke's law library, although he did not use it frequently. He also claimed that the Service's witnesses erred in their perceptions of his relationship with Mr. Clarke. He claimed that Mr. Andrade-Vivar and Ms. Phillip sought out the services of Mr. Clarke and that Mr. Clarke became involved in Ms. Phillip's case when he became ill. He further explained that on a few occasions Mr. Clarke's secretary borrowed his receipt book and therefore such receipts mistakenly suggest that Mr. Clarke was compensated by the respondent's clients.

In his evaluation of the evidence of record, the immigration judge made a number of findings of fact and recommendations to this Board. The immigration judge determined that the evidence established that the respondent had never had its own bank account or any

systematic accounting of its expenses, that Mr. Azard's characterization as donations of amounts paid by clients for whom he performed legal services was not accurate, and that, as evidenced by correspondence submitted by the Texas Comptroller of Public Accounts, the respondent is not in good standing with that agency. On the basis of his factual findings, the immigration judge recommended that the respondent's recognition under 8 C.F.R. § 292.2 (1992) be withdrawn, finding that the respondent organization was created for the sole purpose of allowing Marc Azard to continue to practice immigration law. The immigration judge also recommended that the record in the respondent's case be made available to the Service to commence actions under 8 C.F.R. § 292.3 (1992) against Rev. Azard and Mr. Clarke and to the Texas Bar Association for any actions it deems appropriate.

In accord with 8 C.F.R. § 292.2(c)(4) (1992), oral argument was heard before the Board on July 28, 1992, at which proceeding the respondent through its representative opposed withdrawal of recognition. Subsequent to the immigration judge's recommendation, the respondent has moved for a new hearing, contending that it was denied an opportunity to present evidence. In this motion, the respondent asserts that it intended to present the testimony of two of its directors, Esther Azard and Rev. Daniel Pantlitz, and further, that the respondent has recently discovered new evidence concerning the information provided by the State Comptroller's Office.

At the outset of our consideration, we find no reason to grant the respondent's motion for a new hearing. There has been no showing that the testimony of the proposed witnesses or the alleged new evidence was unavailable at the time of the original hearing. Moreover, the respondent's abbreviated motion fails to identify in what manner the testimony of the two proposed witnesses would add anything to the respondent's case and has not specified in any meaningful manner the relevance of the unidentified new evidence which the respondent claims it has acquired concerning the correspondence submitted by the Service from Texas officials. In the absence of a fuller showing, the respondent's motion is clearly deficient. The record also reflects that the respondent was accorded a full and fair opportunity to litigate its case and present evidence in its behalf. The respondent originally requested a continuance, not to obtain testimony of witnesses who were unavailable for the scheduled hearing, but because its counsel, Mr. Clarke, would be out of town. In fact, when the continuance was denied Mr. Clarke was able to change his travel plans. The record reflects that the respondent, through counsel, waived the testimony of one of its proposed witnesses, Omari Fullerton, even

though the Service did not object to his testimony. On these facts we find no reason to grant the respondent's request for a new hearing.

Under 8 C.F.R. § 292.2(c) (1993), "[t]he Board may withdraw the recognition of any organization which has failed to maintain the qualifications required by § 292.2(a)." This regulation provides that the Service may conduct an investigation into any organization it believes no longer meets those standards, and if such investigation establishes to the satisfaction of the district director in whose jurisdiction the organization is located that withdrawal proceedings should be commenced, the district director shall issue the organization notice to show cause why its recognition should not be withdrawn. 8 C.F.R. § 292.2(c)(2) (1993). Thereafter, a hearing shall be held before an immigration judge who is to receive evidence, make findings of fact, issue his recommendations, and forward the complete record to the Board, which, after according the parties an opportunity for oral argument, shall consider the entire record and render its decision. 8 C.F.R. §§ 292.2(c)(3), (4), (5) (1993). Reviewing these regulations we note that they do not specify the burden of proof, nor what party is to demonstrate lack of qualifications in an action to decertify an organization which has been granted recognition. We find that initially the Service must make a reasonable or colorable showing that the respondent has failed to maintain its qualifications. Once such showing has been made, the organization must demonstrate its qualifications for continuation of its status as an organization recognized under 8 C.F.R. § 292.2 (1993). Because such status is a privilege, we further find that the organization must demonstrate its continuing qualifications by clear, unequivocal, and convincing evidence. We do not find such allocation of the burden of proof or its standard inconsistent with the provisions of 8 C.F.R. § 292.3 (1993) concerning discipline of attorneys and representatives, which state that the Service shall bear the burden of proving the grounds for disciplinary action of attorneys or representatives by clear, unequivocal, and convincing evidence. An action under 8 C.F.R. § 292.3 (1993), which often adversely affects that individual's livelihood, is based upon misconduct and not, as here, lack of qualification of an organization, required to be nonprofit, for the desired status.

Under 8 C.F.R. § 292.2 (1993), recognition is limited to nonprofit charitable, social service, or similar organizations which make only nominal charges for their services. Based upon our review of the evidence of record, we find that the respondent satisfies none of these requirements. Rather, the evidence demonstrates that the respondent has no independent existence apart from Rev. Azard and that the respondent was established to provide a means for Rev. Azard to continue to practice immigration law and to receive an income

through his representation of those needing immigration assistance. The respondent's close association to Rev. Azard from the outset shows this to be so. The respondent's incorporators include Rev. Azard and his wife, and Rev. Azard is identified as the respondent's director, and in fact, he was in charge of the respondent's operations. The respondent's address at incorporation and for many months thereafter was Rev. Azard's own personal residence. On a day-to-day basis there is nothing in the record to show that the respondent conducted any business in its own right. On forms filed with the Service by Rev. Azard concerning the respondent's claimed representation of aliens, the respondent's address was given as 6065 Hillcroft, but nothing listed at that address named the respondent as a listed business and only Rev. Azard was so identified as doing business there. Indeed, both the Service investigators and the testimony of Rev. Azard's two former clients, Ms. Phillip and Mr. Andrade-Vivar support the conclusion that there was nothing in the office to identify the respondent in any way.

The record also establishes that the respondent had no bank account in its own right, and even Rev. Azard acknowledges that any funds paid by his clients were deposited into an account which listed him and his wife as owners and which placed no restrictions on his rights to deposit funds in that account. It is not evident that fees for services were paid to the respondent, rather than Rev. Azard, as receipts for such services were not identified as receipts for the respondent and were not earmarked for the respondent's own account. There is no accounting to show that funds collected were used for any of the respondent's alleged expenses, and indeed, there was no evidence submitted to show that the respondent incurred any expenses, as, for example, there was no documentation concerning any claimed lease or sublease by the respondent of the premises at the Hillcroft address. Although in his testimony Rev. Azard claimed that he could present accounts and ledgers to support his claim that the respondent was a bona fide organization, such documentation was never produced. There is also no evidence to show that the respondent was ever staffed by anyone other than Rev. Azard. Evidence submitted by the Service from Texas officials reflect that the respondent is not in good standing with such authorities who regulate corporate activities, and Rev. Azard confirmed that no taxes had been paid by the respondent, ostensibly because it had no business activities. We note that the respondent has no connection with any outside religious, social service, charitable, or similar group, a factor which underscores its control by Rev. Azard, and we do not find convincing Rev. Azard's claim that the respondent did not qualify for outside support from the Baptist Convention, as such organization is only one source of such

funding. Finally, we note that there is no evidence that the respondent engaged in any activities other than immigration counselling, a factor which strongly suggests that its sole purpose was to provide Rev. Azard with a means to continue to practice immigration law.

In contrast to the respondent's lack of meaningful business activities in its own right, Rev. Azard throughout the period at issue engaged in immigration counselling activities through his claimed relationship to the respondent. Indeed, in the period after the closing of Main World Immigration Service and prior to the granting of recognition to the respondent, the record reflects that Rev. Azard attempted to continue his representation through his association with Mr. Clarke, as Mr. Clarke acknowledged to the immigration judge in January 1991 that Rev. Azard was then working out of his office. Clearly, this suggests Rev. Azard's strong motivation to continue his immigration counselling activities, activities which were enhanced and rendered permissible when the respondent became recognized under 8 C.F.R. § 292.2 (1991). In this interpretation, we find significant the testimony of the two former clients of Rev. Azard who initially made the Rev. Azard's acquaintance through his association with a recognized organization. In their dealings with Rev. Azard through his association with the respondent these witnesses acknowledged that there was no visible sign that the respondent operated an immigration counselling office and they viewed Rev. Azard as their representative in his own right, an impression Rev. Azard did not dispel.

In our consideration we also find that there has been no showing that the respondent provided free services or charged only nominal amounts for legal services, and the absence of such finding supports our conclusion that the respondent was not an independent nonprofit entity but was established only to facilitate Rev. Azard's immigration counselling business. A review of the receipts presented by Rev. Azard to the Service investigator as amounts paid to it for services included some fees which may be nominal in amount, but others which are not. Indeed, some of these receipts show continuing accounts with substantial amounts owed by clients. In his testimony Rev. Azard attempted to characterize such payments as "donations," but he acknowledged that such payments were for specific legal work performed. He also acknowledged that such payments were necessary to fund his activities and that he had established amounts for differentiated services. It is clear that such scheme does not satisfy the nominal charge requirement of 8 C.F.R. § 292.2 (1993). *See American Paralegal Academy, Inc.,* 19 I&N Dec. 386 (BIA 1986). In his testimony, Rev. Azard also acknowledged that the respondent had no independent funding, a factor which necessitated that fees be charged to clients, but which also draws into question the respondent's alleged nonprofit status and

underscores our conclusion that the respondent was not an entity apart from Rev. Azard.[1]

In our review of the evidence, we find that the recognition of the respondent had as its purpose a means to provide Rev. Azard to continue his immigration counselling practice for an income, and therefore we find that such endeavor was not, as required by the regulations, a nonprofit one. In this regard, we find, as did the immigration judge, that Rev. Azard and Mr. Clarke shared a close business association and the evidence suggests that they perhaps both attempted to benefit financially. In this endeavor the respondent's status as a recognized organization was useful because it provided Rev. Azard a means to represent clients before the Service and immigration judges. It is clear, however, that recognition under 8 C.F.R. § 292.2 (1993) was not meant to be a means whereby an attorney could obtain accreditation for paralegal associates, nor a means for an accredited individual to obtain clients for a private attorney, resulting in fee sharing. In the present case, the record demonstrates a close association between Rev. Azard and Mr. Clarke, which again draws into serious question the true purpose of the respondent's existence. The record shows that Rev. Azard and Mr. Clarke shared office space, and Rev. Azard acknowledged that at least initially Mr. Clarke "donated" such space. Mr. Clarke's other facilities such as his personnel and library were also at the respondent's disposal. The record shows that they alternately represented the same clients, as Ms. Phillip's case demonstrates. Also, significantly, when clients seeking free or reduced fee assistance contacted Rev. Azard as the respondent's accredited representative, he would, as in the case of Ms. Phillip and Mr. Andrade-Vivar, introduce them to Mr. Clarke, who then attempted to advise them for an additional fee.[2] Although we are reluctant to define the precise relationship between Rev. Azard and Mr. Clarke, on the evidence of record we have serious misgivings of the propriety of their relationship for purposes of 8 C.F.R. § 292.2 (1993) and such

---

[1] In its submission for recognition before the Board, the respondent claimed that it would charge no fees and that it had obtained independent funding, including support from South Main Street Baptist Church. These statements are clearly contradicted by the evidence of record.

[2] In two cases the receipts presented by Rev. Azard to the Service investigator as evidence of amounts paid to the respondent for legal services reflect that such amounts were paid to Mr. Clarke. In his testimony Rev. Azard denied that such amounts were paid to Mr. Clarke, claiming that a new secretary mistakenly issued such receipts. Even if we were to accept such explanation as credible, such incidents underscore the close association between the respondent and Mr. Clarke. Moreover, in her testimony, Ms. Phillip stated she paid Mr. Clarke, not Rev. Azard, although both worked on her case.

misgivings support our conclusion that the respondent was not a nonprofit organization.

In summary, we find that the respondent was not a nonprofit organization, independent of and separate and apart from Rev. Azard. Rather, for Rev. Azard, a law school graduate unable to pass the bar, the respondent's recognition provided him with a way to continue his immigration counselling practice and to receive an income. Accordingly, the respondent's status as an organization recognized under 8 C.F.R. § 292.2 (1993) will be terminated.

**ORDER:** The respondent's status under 8 C.F.R. § 292.2 (1993) is terminated.